is number 17-2987, United States v. McClure-Potts. Mr. Ulrich and Mr. Cerruti. Good morning. May I please report, Frederick Ulrich. I'm an assistant federal public defender in the Middle District of Pennsylvania. I represent the appellants, Stephanie McClure-Potts. I'd like to reserve two minutes of my time for that. You sure can. Addressing at the outset the specific offense characteristic at issue in this case, which is whether Mrs. Potts committed this offense other than for profit. We believe Mrs. Potts was entitled to a three-level reduction under the Guidelines provision because she did not harbor, Arthur Samarin, a payment or the expectation of payment. This is consistent with the guilty plea and plea agreement in this case, in which the government did not prosecute her ultimately for private financial gain or commercial advantage. But it's also consistent, more importantly, with the facts surrounding the relationship of these parties. When they took Mr. Samarin in, they didn't do so on the basis of some motivation for profit. They took him in for other reasons because they wanted to help him out. How does the receipt of a government benefit not constitute a payment? Because the harboring itself did not occur as a for. In other words, the IRS wasn't paying Mrs. Potts to harbor Arthur Samarin. Well, the definition says other than for profit means there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens. And so here there's an opportunity to obtain benefits, and it would appear that she and her husband obtained a benefit from seeking those on his behalf. So they received some sort of ancillary benefit, but the language of the guideline provision is pretty explicit. It says you harbor for payment or the expectation of payment. The IRS isn't returning an earned income tax credit to Mr. and Mrs. Potts because they were harboring Arthur Samarin. It says there was no payment. Other than for profit means there was no payment or expectation of payment, right? Well, you can read it that way. I mean, that's what it says in the commentary, right? Well, except that there was no payment or expectation of payment for harboring, and there was no expectation or payment for harboring. The payments were made for other reasons. Now, the government was well within its rights to prosecute the Pottses for welfare fraud. Indeed, they were prosecuted at the state level for that. They could have prosecuted them for tax fraud perhaps, but they didn't. And the guideline provision, if they want an expansion of that particular definition, the better way to do it as opposed to an ad hoc basis by the courts is to simply have a sentencing commission redraft the thing and make it more, scoop up more cases that might have an ancillary benefit associated with them as opposed to one. And it's pretty clear, by the way, that this provision was drafted for these individuals that are smuggling people across the border, coyotes as they're referred to in some of these cases, where they get direct payment or indirect payment because they're part of some sort of larger conspiracy. But that's not what happened here. They took Mr. Samarin in for other reasons, received some sort of ancillary benefit down the road, and it had nothing to do with... What does it matter whether the... I love the use of the word ancillary here. I'm not sure that it's necessarily appropriate, but fine. What does it matter whether the benefit is today, tomorrow, or six months from now? If she's engaging in activities that she derives a benefit from and it's not a quid pro quo, you give me money, I'll smuggle you in, why doesn't that fall exactly within the notion of other than for profit? Well, one reason it might not fall within the notion of for profit is a sentencing commission might think it more appropriate to punish more severely a person who's profiting off the backs of the individuals that they're smuggling into the country or harboring. But that's not what happened here. This, again, was a collateral or ancillary benefit that inherited the POTSs unrelated to the harboring. It just simply happened they were actually receiving an earned income tax credit before they started harboring Mr. Samarin, and they received public assistance benefits before they started harboring Mr. Samarin. What's the standard of review here? For these facts, it's clear error, right? We believe that any application of a guideline provision, the review standard would be underwritten. All right, but when we're looking at the findings of the court, don't we have to apply a clear error standard? We would, and we believe that the court's wholesale adoption as fact-finding of the double hearsay self-serving statement of a co-defendant was improper in this particular circumstance. That gets me to a second part of my argument, but I'll be happy to— Isn't that your strongest argument? It may be. I mean, here you needn't look very far into the statement. I mean, depending on which proper statement you look at, because there are some minor differences in the transcription of these two statements, either Exhibit 10 or Exhibit 11 of the government's filing. But the one the court adopted was Exhibit 11. See, he says he entered legally. Well, that's not entirely true, because there's a Harrisburg police report that shows that he doesn't have an entry stamp for the United States. So it's not entirely clear that he entered legally. And he also got into a lot of trouble here in the States. I'm sorry? He also got into a little trouble here in the States. Yes, he did. And on top of that— So what was your reasoning for allowing that proper to come in from Samerman, who was no longer in the country? I'm not sure she offered a reason other than district courts permitted, providing there's an additional liability, to adopt hearsay statements. In this case, we think it was inappropriate to wholesale adopt it, particularly when there's all these discrepancies within it. For instance, he says the POTS took $2,000 from him to hook him up with his immigration attorney. But as it turns out, he wrote a check out— For 690. —to the immigration attorney. He says nothing happened as a result of them taking the $2,000. That's not true either. They got an extension of his visa through the immigration attorney that he retained. It's unlikely that he had $2,000. His account was well overdrawn. The fact that he also said he was motivated by a fear of returning to the Ukraine, well, this isn't some guy coming from El Salvador or Nicaragua where there's a complete breakdown in civilian government. His father was a law professor in the Ukraine. He was a university student. His mother was supporting him. So he's not fleeing from some sort of circumstances where you might understand why he wouldn't want to go back. Well, if that's the circumstance, doesn't it nerdy your client's detriment when we look at the benefits that she derived? I mean, for instance, if you're talking about the false Social Security benefit, you contend that the offense was applying for a false Social Security number, not using one, because simply applying for one under false pretenses doesn't imply that Potts knew she could or would later get tax breaks or food stamp assistance. But why else would one apply for a false Social Security benefit but for to use it in the future? I'm not getting that. Well, we actually don't need to look very far to get that answer. It turns out one of the things in Mr. Samard's statement is an explanation of why this whole Social Security card thing became an issue. He says, I'm going to this Upward Bound program at Penn State. The counselor's there to contact him and the Potts' and say, well, we can't put him in the program unless he's got a Social Security card. So it's pretty clear if you're going to adopt his statement, then the underlying theory that the government proceeded on, and which the district court ultimately adopted, which was they were somehow going to surreptitiously get this Social Security card and then get these extra benefits. Well, according to Samard, that's not the reason why. Well, are there no benefits that your client derives from that? From Samard having a Social Security card? Yes. Well, ultimately, as I said, they went back and amended their tax returns and then later applied some years later, a couple, for public assistance benefits, and they got extra benefits. For staff and medical assistance benefits that she wasn't eligible for. That's correct, and she was prosecuted for that. And those, again, ancillary benefits, and it sort of transitions into the last part of my argument, which is this loss amount that the district court awarded was not tied to the offense of conviction. The offense of conviction was obtaining a Social Security card by fraud. This court in Pressler, in a fairly lengthy footnote, said that it's the facts related to the offense of conviction, the underlying facts of the specific criminal offense to which the individual pleaded guilty. She pled guilty to obtaining a Social Security card by fraud. She didn't plead guilty to tax fraud or welfare fraud in federal court, and so, therefore, the benefits that she received would not be loss amounts under the relevant conduct guideline, which is tied to the offense of conviction. And the court's opinion in Pressler was for what it's worth, ultimately adopted in the Penn Circuit in Blackwell. And so the offense of conviction is quite a bit narrower than what the district court ultimately did. Let me go back to Judge Greenaway's opening questions on the other than for profit. The application notes define offense committed other than for profit to mean there was, quote, no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens. Now, maybe the smuggling and the transporting part don't fit, but she harbored someone who was an unlawful alien and then went out and attempted to get benefits that she otherwise wasn't entitled to. Is there a time? Does this particular provision of the sentencing guidelines apply to the time the person came in, or can it also apply to the time that the person is here, i.e., when you are harboring that person? Well, I think it would be tied to the time of the underlying conduct at issue. In this case, it was harboring conduct as opposed to smuggling them in. But at the time they initially started harboring Mr. Samarin, they certainly weren't motivated by some profit. In fact, if you look at all the money that they spent, birthday parties, medical treatment, housing, food, clothing, families, camps, they were certainly spending a lot more than they were taking in. They weren't making a profit, that's for sure. And our position is simply that the IRS isn't paying these earned income tax benefits because somebody is harboring an illegal alien and neither is the Department of Public Welfare. Those benefits were collateral, ancillary, or whatever word you want to use, but they certainly weren't for harboring. That's the position that we had taken in the district court and we're taking here because that's the way the guidelines are written. And if it needs to be adjusted, the Sentencing Commission can do that. The courts don't have to do it on an ad hoc basis. Any further questions? No. We'll get you back on the phone. Okay. Thank you. Mr. Cerruti? Thank you, Leader of the Court. Steven Cerruti on behalf of the United States. Could you start off with a question that Judge Greenaway started off with and I asked? When you have – when is that sentencing guideline – how does it work when you do something other than for profit in connection with transporting, smuggling, or harboring a nonresident or illegal alien? Usually you think of it normally bringing somebody in and there's a quid pro quo. This is a little different. Right, and I think the nature of applying it to harboring or a harboring offense is going to change the timing. I do agree with the opposing counsel that I think it's going to apply over time as long as that harboring is going on. And certainly if you're looking at whether it was done other than for profit over a time period that there may have been some sort of payments or expectation of payments. I think that the smuggling or transporting might be much more discreet because that seems to be more of an event than harboring, which is an ongoing relationship. I'm confused by the use of the term profit by your adversary because I thought the whole point of this was what benefit might one derive from harboring that is not a quid pro quo payment for harboring. I mean I thought that's what the guideline was supposed to capture. Am I not thinking about it the right way? Well I think when you look at, particularly in some cases from other circuits cited in the brief, Perez-Ruiz, Juan Manuel, they look at the explanation of what is for profit being payment or expectation of payment and find that that payment doesn't necessarily have to be monetary and can be something that the defendant values. Like a government benefit. Like a government benefit. Or, and there was a lot of talk about the government benefits, but also it would point out that you have the fact that Samarin was expected to turn over any money that he made to the Potts, which he did and they deposited in their own bank accounts, that the housework that he was doing at the house, the college coursework that he was doing on behalf of the defendant. Is it relevant that, as your adversary points out, they threw him parties, they provided him health care, things that probably overwhelmed the amount of profit they could have gained? I don't think so, Your Honor, because we don't, whether, even if this wasn't a harboring case, if this was a transportation case, do we get into how the person who got paid for the transportation spent the money that they got? No. I mean, would we give them a pass on this if, you know, they blew a transmission in the van that they were being paid to use and had to sink all of their money into fixing the transmission? They didn't profit from that then, other than the fact that they had money that they wouldn't otherwise have. And that would be the same thing here. They got the benefits and they chose how to use it, and so, therefore, I don't think that allows them to escape or allows the defendant to escape being found to have taken an action for profit. Is there anywhere in the record that can corroborate Samarin's claims that the Ponces required him to give them money, do college coursework, or took $2,000 from him to pay for an immigration attorney? Is there anything other than his federal property? The immigration attorney, there's obviously some different facts there, whether that is actual deceitfulness or whether it's just failing on his memory isn't clear. I think to directly answer your question, I think if you look at the fact that, you know, the government produced all of those exhibits for the hearing that show him being cut checks by various entities, Penn State, some others, and then ultimately show the bank records, which show that those were not deposited into his accounts. They were deposited into the Ponce's accounts. So that would corroborate his statements that, look, whenever I had money, they demanded that I turned it over because they took that money and put it into their own accounts. So that would be the corroboration there. Admittedly, with regards to the college coursework and the work around the house, you know, there's no independent corroboration there because it happened within the studio apartment, and I don't know that there's anyone else who saw it. My problem is what evidence, apart from McClure's Ponce's own lack of credibility, is there to support that Samerin was credible? Well, I think, again, looking at the bank records and what happened with the money that Samerin made and what was done with that is what he claimed. Also, you can look at his statement and say, look, they threatened me that if I did away with this or didn't do what they said that they would turn me into immigration authorities, they would do all sorts of bad things. That's exactly what they did. Once he sought to get out of this arrangement, they called the police and made accusations that were completely false about him looking at weapons and having weapons, making statements against the Jews, and turned him in. They did exactly what it is that they had threatened they would do if he sought to get out of their arrangement. So that would corroborate a part of his story. There's no question Samerin lied a lot when it came to this offense. There's no question about that. But there's also no question that McClure Ponce was also a deceitful and conniving person, and so when the district court is faced with trying to figure out which version there is to believe, she did exactly what she was supposed to do. Look at where there is corroborating evidence, and there is corroborating evidence with regard to Samerin's story that simply doesn't exist with regards to McClure Ponce's story. Like what? What are some of the other corroborating evidence? I would rely on what I've already discussed here. Follow the money that he said he made that we know was paid. The checks were cut to him, but then were put in her account or her husband's account, and the fact that she carried through on the threat and did exactly what he says. It would seem the case would be stronger against her if you looked at the pre-'97 guidelines where it talks about financial gain or commercial advantage for harboring. It's been changed to payment. Wasn't it changed to payment for illegal harboring? Yes, it was. So is this a payment for illegal harboring? I mean, to me, the pre-'97 language supports the government's position more than the post-'97 or the 97 language that the amendment made in 97. And that's certainly the defendant's argument that the government respectfully disagrees with that. And if you look at the reasoning behind the amendment where they talk about the reason for changing the wording was actually to narrow the field of people who would qualify for the exception. And when you look at the fact that before when it talked about financial gain or business transactions, that sort of thing, it really did keep it to financial gain and business, whereas now it's just talking about payments generally, which don't necessarily need to lead to financial gain. And again, if you look at the Seventh and Eighth Circuit and the way that they've interpreted payments to be anything of value, well, anything of value can fall outside of mere financial gain or business advantage. So we would argue that the Sentencing Commission did do exactly what they said they were trying to do, which was narrow the class of defendants who would be entitled to this reduction. I mean, obviously, most of the cases we see and probably you see, you know, there's clear smuggling offenses and a clear payment. It's easy to put two and two together. This one seems quite atypical. Oh, it is very atypical. There's no question. You're right. The Coyote example would be the one that is the classic example here. But the mere fact that this doesn't fit into the classic example of what would be harboring or transporting or smuggling for profit doesn't mean that the guideline doesn't apply. The guideline does apply based on the language that it's used and has been interpreted by other courts and should be interpreted by this court as well. Okay. Any further questions? Okay. Thank you very much. Mr. Oward? Just to quickly address a couple of the government's points. One is, yes, Mr. and Mrs. Potts turned him in to the authorities to their own detriment. They really wanted to hide from this in their own roles. They certainly aren't contacting the government officials and telling them about this. Well, ultimately to their own detriment. That certainly wasn't the intention they had when they made the call. They hoped it would go the other way. Well, it may be, but why not just contact ICE if you're going to do that? Why bring in the Department of Homeland Security, the FBI, everybody else? I'm not sure that we have to figure that out. Well, we don't have to. But two other points. One, yes, the guideline was altered in 1996 as a result of, and it was narrowed. That's true. But for reasons different than what the government's offering. It was narrowed because it used to basically allow people that were working for these larger organizations, smuggling people in, to avoid the specific offense characteristic by saying, well, these guys that I'm smuggling, they didn't pay me the money. They paid it to somebody else, and I got paid by them. So that's one reason. The other reason is they changed the beginning language from active voice, the defendant was expecting no payments, to passive voice. Again, to encompass these conspiratorial arrangements, but not necessarily to scoop up an outlier case like this one. And to answer Judge Greenaway's question, I'm not sure I'm going to be able to convince you of this, but one way to fix the problem that you see is simply to have the sentencing commission, instead of, say, payment for smuggling or harboring, payments received as a consequence or result of. That's a fairly easy fix, and then we don't have to, you know, haggle over the language. And as soon as they fix it, I'll agree with you. Thank you. All right. Thank you very much. Thank you to both counsel for well-presented arguments. And we'll take the matter under advisement.